IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TRACY N. PARNELL,

                 Petitioner,

vs.

SCOTT R. FRAKES,

                 Respondent.

**8:20CV352**

**MEMORANDUM AND ORDER**

This matter is before the court on Tracy N. Parnell's ("Petitioner" or "Parnell") Amended Petition for Writ of Habeas Corpus. (Filing 24.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

As set forth in the court's order granting Parnell leave to amend his habeas petition (filing 23), Parnell asserts the following claims in his amended petition (filing 24) that were potentially cognizable in this court:

Claim One:        The Nebraska district court and Nebraska Supreme Court have denied Petitioner an evidentiary hearing and granted a new trial on the ground that the State withheld exculpatory evidence which was discovered by accident in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Claim Two:        The Nebraska district court and Nebraska Supreme Court have denied petitioner an evidentiary hearing on the issue of ineffective assistance of trial counsel in failing to call

O'Kelly as a witness, although O'Kelly had not yet performed the essential "drive" test, among others, at the time of the trial and grant relief in the form of a new trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.[1]

## II. BACKGROUND

### A. Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court on direct appeal in *State v. Parnell*, 883 N.W.2d 652 (Neb. 2016) (filing 14-1).[2] *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

#### 1. Shooting

On October 30, 2012, at around 8:14 p.m., Eriana Carr and Nakia Johnson were shot outside of Carr's residence in Omaha, Nebraska. Carr was shot twice and died from her injuries. Johnson was shot 11 times and survived. Johnson told investigators that the shots came from "a blue Nissan Altima with a messed up front bumper." She did not see the shooter.

#### 2. Threat

During a pretrial hearing, Johnson explained how she met Parnell. This occurred at a September 2012 birthday party for one of Johnson's friends, who was

---

[1] The claims as stated here are taken directly from Parnell's amended petition. (Filing 24 at CM/ECF p. 12.)

[2] The footnotes appearing in the Nebraska Supreme Court's recitation of facts have been omitted from this order.

involved with Parnell. Johnson knew Parnell only by his nickname, "Laylow." At that birthday party, Johnson had a short conversation with Parnell regarding his car, a blue Nissan Altima. She told him that a Nissan Altima was her favorite car, and Parnell responded, "'That's what's up.'" Then Parnell left.

Johnson told investigators that Parnell threatened her 2 days before the shooting. Johnson testified that the threat occurred on October 28, 2012, after "a little get-together" at her friend's apartment, where she sometimes stayed overnight. Parnell and several other people attended the get-together. A man with whom Johnson was involved, Ryan Fraiser, attended and later left. Fraiser is from another "hood" and a different gang than the others at the party. Johnson went to bed after the party and was awoken by Parnell and three others. They were yelling at Johnson because "they felt like [she] had brought someone into the house from another side," or "[a]nother hood."

Eventually the others left, but Parnell remained. He paced back and forth in front of Johnson's door and was "saying all kind[s] of stuff . . . indirectly to [Johnson]." Johnson told Parnell to "[s]hut the [expletive] up talking to me," and Parnell left. He returned with a gun in his hand. Parnell stared at Johnson while holding the gun. Johnson grabbed her cell phone, and Parnell told her to call Fraiser and tell him that Parnell would "be outside waiting for him." Johnson was scared and called the 911 emergency dispatch service because Parnell "was blocking [her] way to the door" and she did not know "what was about to happen." When Johnson ended the call, Parnell left.

Parnell was eventually prosecuted for the threat, but not until after the shooting. At that point, the State filed an information charging Parnell with committing terroristic threats. He pled no contest and received a sentence of 20 to 24 months' imprisonment.

3

### 3. Nissan Altima

Detectives investigated the Nissan Altima involved in the shooting. They discovered that Parnell had been stopped while driving a blue Nissan Altima several months earlier. The registered owner of the car was Jasmine Nero, who was also the mother of Parnell's child.

An investigator testified that she interviewed Parnell and asked him about the Altima. Parnell claimed that he only drove his aunt's car and that he never drove any of Nero's vehicles. He denied any knowledge of an Altima.

In a call from jail, Parnell spoke to Nero about the Altima. Nero testified at trial that she understood from that call that Parnell wanted her "to get rid of" the car. Nero moved the car to a garage, where investigators later found it. The car's front bumper was damaged, and it contained a box with Parnell's thumbprint on it.

### 4. Pretrial Motions

The State filed an information charging Parnell with five counts: murder in the first degree, two counts of use of a deadly weapon to commit a felony, attempted first degree murder, and possession of a deadly weapon by a prohibited person. The district court ordered mutual and reciprocal discovery "pursuant to statute."

Before trial, the State filed a notice under rule 404 of its intent to offer evidence of Parnell's terroristic threat against Johnson to show motive, intent, and plan. Parnell filed a motion in limine requesting to exclude the State's cellular analyst pursuant to the standards of *Daubert/Schafersman*. The district court held a joint hearing on the motions. Later, Parnell filed a motion to continue the trial.

**(a) Rule 404**

In the portion of the joint hearing related to rule 404, Johnson testified regarding Parnell's threatening behavior before the shooting. The State introduced Johnson's 911 call, a certified copy of Parnell's conviction and sentence for terroristic threats, and police reports about the threat.

In a written order, the district court concluded that Parnell's threatening behavior was inextricably intertwined with the crime charged and therefore not subject to rule 404. It reasoned that it "forms part of the factual setting of the murder. It is evidence that explains an integral part of the immediate context of the crime charged." The district court concluded further that even if the threat was subject to rule 404, it would still be admissible, because it "demonstrates [Parnell's] motive and that the subsequent shooting was gang related; thus it is admissible to show intent."

**(b) *Daubert/Schafersman***

In the *Daubert/Schafersman* portion of the joint hearing, the State's expert, William Shute, testified regarding his qualifications and methods. Shute is a special agent with the Federal Bureau of Investigation (FBI) and a member of the FBI's "Cellular Analysis Survey Team." He performs "historical cell site analysis" using call detail records provided by cellular carriers.

Shute explained that call detail records show the "first serving cell site," which is the tower a particular cell phone used, and the "first serving cell face," which is the sector of the tower used. Cell towers usually have three sectors. The FBI's survey team members use call detail records to determine "what tower and sector of the tower was being utilized for service" and then plot the towers and sectors on a map. They then look for patterns and "come up with a geographical plot as to where [they] believe that individual is at that particular time."

Shute also testified regarding the locations of Parnell's cell phone around the time of the shooting. He prepared a PowerPoint presentation that included Parnell's call detail records. The records showed that Parnell's cell phone connected to tower: (1) 201 at 7:52 p.m., (2) 729 at 8:07 p.m., (3) 201 at 8:11 p.m., (4) 729 at 8:20 p.m., and (5) 201 at 8:20 p.m. Shute plotted the towers and their coverage areas on a map. The map showed the coverage areas as shaded "pie wedges."

Shute testified that the coverage areas for towers 201 and 729 overlap. He said that the way that Parnell's cell phone switched between towers 201 and 729 showed that it was definitely located within the overlapping coverage area at the time of the shooting. A map in his PowerPoint presentation depicted the crime scene within the overlapping area.

The court overruled Parnell's motion in limine. It concluded that Shute was qualified to testify as an expert and that his methods were reliable.

### (c) Motion for Supplemental Discovery

In March 2015, Parnell filed a motion requesting supplemental discovery from the State. The motion is not in our record. Parnell's counsel, Daniel Stockmann, filed an affidavit with the motion. This affidavit is in our record. In it, Stockmann states that he learned that certain undisclosed discovery materials existed after he attended a March 6, 2015, seminar where cellular analyst Michael O'Kelly presented. In the discovery process, the State had shared a police report and maps showing that O'Kelly had performed basic cell phone mapping services for the Omaha Police Department.

After the seminar, Stockmann e-mailed O'Kelly and asked whether he had performed services for the department which were not disclosed in the police report. O'Kelly's counsel responded and said that although O'Kelly could not disclose what work he had performed for the department, he could confirm that O'Kelly performed more services than were disclosed in the report. Parnell then filed the motion for

6

supplemental discovery regarding O'Kelly's services, which the district court granted.

After the court ordered supplemental discovery, O'Kelly provided Parnell's counsel with an affidavit detailing his interactions with the State, and the State disclosed a series of e-mails between O'Kelly, Det. Sherry King of the Omaha Police Department, and Deputy Douglas County Attorney Brenda Beadle.

In his affidavit, O'Kelly stated that he "reviewed the . . . call detail records and concluded that [Parnell's cell phone] appeared to travel from the west side of Omaha [where Parnell lived] to the east side, then north and south and then traveling back to the general area on the west side." O'Kelly said that he "began processing and mapping the individual cell site registrations. The handset transition west to east, north/south and east to west activities were confirmed." He then "provided Detective King with multiple maps depicting handset movements consistent with cell site registrations that supported physical movement from Omaha's west side to the east side and possible travel movements north and south on the east side."

O'Kelly also stated that he informed King that "it is impossible to identify a specific location stop(s), specific surface roadway travels based upon the existing cellular data." He told her that "drawing circles and other shapes with defined boundaries is unreliable and at best simple guessing with an agenda. The 'guessing' may be based upon experience and training but will still have no foundation and/or credible support that is rooted with existing electronic wireless data." And he told her that "in order to possibly place the subject [cell phone] in the immediate area of the crime scene . . . it will be necessary to conduct an RF Signal Field Survey." He "provided an explanation of the FBI's RF Signal mapping approach versus the O'Kelly approach." And he explained that his approach to performing such a survey, or drive test, "is time consuming and labor intensive covering days if not weeks." He said that after performing the survey, the tower coverage areas would "appear similar to that of an amoeba and will be unique to each cell site."

In the e-mails, King asked O'Kelly whether he had a formal report to present to the county attorney's office. O'Kelly responded that a report in writing would be "[d]iscoverable" and that he "would recommend the county attorney and I visiting and then letting them decide." Although the documents do not contain a record of a call, they do contain a followup e-mail that indicates that O'Kelly spoke with Beadle.

### (d) Motion to Continue or Exclude

On March 23, 2015, Parnell filed a motion asking the court to exclude Shute's testimony or continue the trial, which was scheduled to begin March 30. The motion was based on the State's "belated disclosure of discovery materials" related to O'Kelly. In the motion, Parnell acknowledged that the State had previously disclosed that O'Kelly worked on the case. He argued that the State violated its duty under § 29–1912 and *Brady v. Maryland* to disclose O'Kelly's opinions that a drive test was necessary and that the FBI's methods were not reliable.

At the hearing on the motion to continue, Parnell offered O'Kelly's affidavit. He did not offer the series of e-mails between O'Kelly, King, and Beadle. Stockmann argued:

> [T]he second that . . . Shute . . . provided the opinions to the government, the government, whether through law enforcement or the county attorney, was aware that an exculpatory opinion from . . . O'Kelly existed. [It had] an obligation to tell me about . . . O'Kelly's exculpatory opinion. [It] didn't tell me about it; I had to find it out on my own because I went to a seminar . . . .

The State responded that O'Kelly's opinion was not exculpatory and that he placed Parnell's cell phone in the same area as had Shute, although he was not as specific.

8

The court noted that because the State planned to take a week to present its evidence at trial, Parnell had "12 days," and it said that "O'Kelly can get his stuff together in 12 days" in order to testify. It also stated that "[i]f [Parnell] wanted to hire a cell tower expert, [he] could have done it at any time in the last two years."

In its written order, the district court found that the evidence relating to O'Kelly was not exculpatory and that it "[h]ad been provided to [Parnell] at an early date." Therefore, it was not a valid reason for a continuance. The court also entered an order permitting Parnell to retain O'Kelly as an expert witness.

Before trial, Parnell renewed his motion to continue the trial. At that time, he offered an exhibit containing the e-mail exchanges between O'Kelly, King, and Beadle. He said that he "neglected to offer" it at the earlier hearing. The court overruled the renewed motion.

### 5. Trial
### (a) Testimony

At trial, Johnson testified and described the shooting, the blue Nissan Altima, and the threatening incident days earlier. Shute's testimony was consistent with his testimony at the *Daubert/Schafersman* hearing—he stated that towers 201 and 729 form an overlap area and that Parnell must have been within the overlap area at the time of the shooting. O'Kelly was present throughout the trial but did not testify.

Nero testified regarding the Altima and her relationship with Parnell. She stated that on the night of the shooting, she left Parnell at home with her children while she took her niece to ballet class. She left the Altima at home and drove another vehicle. When Nero returned at 8 p.m., Parnell, her children, and the Altima were not there. Parnell and the children returned in the Altima later that night.

Nero also testified that she lied to police for Parnell and was charged with being an accessory to a felony as a result. She said that when detectives asked her

about the Altima, she lied and told them that it was not working. She admitted that she did so "[t]o protect [Parnell]" because "he asked [her] to lie."

### (b) Jury Instruction

Parnell requested a jury instruction regarding accomplice testimony based on NJI2d Crim. 5.6. The requested instruction read as follows:

> There has been testimony from . . . Nero, a claimed accomplice of [Parnell]. You should closely examine her testimony for any possible motive she might have to testify falsely. You should hesitate to convict [Parnell] if you decide that . . . Nero testified falsely about an important matter and that there is no other evidence to support her testimony.
>
> In any event, you should convict [Parnell] only if the evidence satisfies you beyond a reasonable doubt of his guilt.

The district court refused the instruction and gave a general instruction regarding witness credibility. The jury found Parnell guilty on all counts.

### 6. Motion for New Trial

Parnell filed a timely motion for a new trial and submitted another affidavit from O'Kelly as support. He argued that O'Kelly's statements in this second affidavit constitute newly discovered evidence, which could not have been discovered and produced at trial.

In O'Kelly's affidavit, he averred that after his initial work on Parnell's case, he "informed the government that additional field testing by means of a 'drive test' would be required in order to move from speculation to accuracy in the cell tower connection plotting." A drive test involves making cell phone calls while driving and then obtaining call detail records to see which towers the cell phone used. Shute did

not perform such a drive test. O'Kelly was extremely critical of Shute's methods and conclusions.

O'Kelly began a drive test on the last day of the trial. In his affidavit, he stated that the drive test revealed that the crime scene was "situated in a valley between Cell Sites 729 and 201" and that towers 201 and 729 are 1.84 miles apart. The drive test showed that the coverage areas for towers 201 and 729 do not overlap or border each other, as Shute claimed. Instead, they are separated by five other towers, which provide coverage in the overlap area that Shute identified. O'Kelly said that Parnell would have had to leave the crime scene area in order to connect to tower 729. However, he also said that the data showed that Parnell's cell phone "was in the general vicinity (1–2 miles of the crime scene) before, during and after the shooting."

The district court overruled Parnell's motion for a new trial. In a written order, it first concluded that Parnell could have discovered and produced O'Kelly's opinions using reasonable diligence, or, he could have at least "diminished the weight of . . . Shute's conclusions by calling O'Kelly as a witness." The court noted that Parnell was "at least partially at fault for the late discovery," because the State disclosed that O'Kelly worked on the case early in the discovery process.

Second, the court concluded that O'Kelly's opinions were not material, because they would not have affected the outcome of the trial. It reasoned that O'Kelly's drive test results "seem to incriminate [Parnell]," because Parnell made several calls around the time of the shooting that connected to tower 201, and O'Kelly's test showed that the signals from tower 201 "permeate the area immediately surrounding the crime scene."

## B. Direct Appeal

Parnell appealed his convictions and sentences to the Nebraska Supreme Court. (Filing 14-1.) Parnell was represented at trial and on direct appeal by separate counsel. In his direct appeal, Parnell assigned and argued that (1) the trial court erred

in overruling his motion to continue or exclude the state's expert (Shute) testimony on cell phone mapping based on newly discovered evidence of a contrary expert opinion (O'Kelly) received by the state; (2) the trial court erred in admitting Nakia Johnson's testimony concerning his prior bad act finding it was inextricably intertwined to the instant offence and is not subject to Neb. Rev. Stat. § 27-404(2); (3) the trial court erred in overruling his motion for new trial finding the newly discovered evidence was immaterial and could have been discovered through reasonable diligence and presented at trial; (4) the trial court erred in refusing to instruct the jury regarding accomplice testimony where it was warranted by the evidence; and (5) he was denied effective assistance of counsel by trial counsel's failure to call a defense expert to testify in opposition to the state's expert. (Filing 14-8 at CM/ECF pp. 6-7; *see also* Filing 14-1 at CM/ECF pp. 10-11.)

In an opinion dated August 26, 2016, the Nebraska Supreme Court affirmed Campbell's convictions and sentences, rejecting his claims on the merits. (Filing 14-1.)

The U.S. Supreme Court denied Parnell's subsequent petition for writ of certiorari. (Filing 14-2.) The question presented in his petition was: "Does *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny require the State to disclose a retained expert's exculpatory opinion in a timely manner so as to provide the Petitioner the ability to meaningfully use the information?" (Filing 14-10 at CM/ECF p. 10.)

## C. Postconviction Motion

On July 12, 2017, Parnell filed a timely pro se motion for postconviction relief in which he alleged claims of trial court error, prosecutorial misconduct, and ineffective assistance of trial and appellate counsel, which was denied without a hearing. (Filing 14-20 at CM/ECF pp. 2-7; *see also* Filing 14-3 at CM/ECF p. 3.) The District Court of Douglas County, Nebraska found all of Parnell's claims procedurally barred because they "were known or knowable at the time of his direct appeal." (Filing 14-20 at CM/ECF p. 7.)

**D. Postconviction Appeal**

Parnell appealed the judgment of the state district court to the Nebraska Supreme Court. He assigned that the state district court erred in determining that his claims were procedurally barred. (Filing 14-4 at CM/ECF p. 8; Filing 14-13 at CM/ECF p. 8.) Parnell alleged that his claim of ineffective assistance of appellate counsel for failing to raise trial counsel's failure to "introduce certain evidence and correct prosecutorial misconduct" was not procedurally barred, arguing appellate counsel failed to raise trial counsel's failure to (1) introduce the e-mails between O'Kelly, King, and Beadle into evidence at trial, and (2) raise the issue of prosecutorial misconduct for presenting Shute's misleading testimony. (Filing 14-13 at CM/ECF pp. 14-21.)

On May 29, 2020, the Nebraska Supreme Court affirmed the judgment of the state district court. (Filing 14-4 at CM/ECF p. 12.) In its decision the court concluded that Parnell's claim of ineffective assistance of appellate counsel for failing to raise trial counsel's failure to submit the e-mails between O'Kelly, King, and Beadle into evidence at trial was not procedurally barred, but ultimately affirmed the trial court's holding, concluding that Parnell failed to show he was prejudiced by appellate counsel's failure. (*Id*. at CM/ECF pp. 8-12.)

**D. Habeas Petition**

Parnell filed his Petition for Writ of Habeas Corpus acting *pro se* in this court on August 31, 2020. (Filing 1.) In response to the Petition, Respondent filed an Answer (filing 17), a Brief (filling 18), and the relevant state court records (filing 14). Parnell sought leave to amend his Petition to clarify his claims following retention of counsel (filing 22), which was granted by this court (filing 23). Parnell via counsel then filed an Amended Petition (filing 24), to which Respondent filed an Answer (filing 28), and a Brief (filing 29). Parnell then filed his Brief in support of

the amended petition (filing 30), to which Respondent filed a Reply (filing 33), and an Amended Answer (filing 34). This matter is fully submitted for disposition.

## III. OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Parnell's claims.

### A. Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before

14

those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[3] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in §

---

[3] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106.

2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that

contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

17

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## C. The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

18

would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

## IV. DISCUSSION

### A. Claim One

In Claim One Parnell alleges that the State withheld exculpatory evidence which he submits was discovered by "accident" in violation of his Fourteenth Amendment right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963). (Filing 23 at CM/ECF p. 1; Filing 24 at CM/ECF p. 12.)

The Nebraska Supreme Court rejected this claim on the merits on direct appeal, finding as follows:

First, we conclude that the timing of the State's disclosure of O'Kelly's opinions did not violate Parnell's right to due process. Under *Brady*, the nondisclosure by the prosecution of material evidence favorable to the defendant, requested by the defendant, violates due process, irrespective of the good faith or bad faith of the prosecution. Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. But *Brady* is not violated where the evidence is disclosed during trial. And here, the State disclosed the pertinent evidence 1 week *before* trial. Clearly, Parnell's right to due process was not violated by the timing of the disclosure.[4]

(Filing 14-1 at CM/ECF pp. 11-12 (emphasis in original) (citations omitted).)

In support of Claim One in his petition Parnell does not address why *Brady* was misapplied. In fact, Parnell places little focus on the exculpatory evidence mentioned in Claim One, which this court assumes is cellular analyst, and expert initially retained by the state, Michael O'Kelly's opinion, which he received a week before his trial and was previously addressed by the Nebraska Supreme Court on direct appeal. (Filing 30 at CM/ECF p. 12.) Instead, Parnell points to "reported decisions that summarized SA Shute's testimony regarding his methodology and the use a 'drive' test" as evidence that is "contrary to [Shute's] sworn testimony" arguing that any discrepancies "should be resolved through an evidentiary hearing." (Filing 24 at CM/ECF p. 12; Filing 30 at CM/ECF pp. 6-10.)

Under *Brady* "the prosecution is required to divulge all evidence favorable to the accused that is material either to guilt or to punishment." *Dye v. Stender,* 208 F.3d 662, 665 (8th Cir. 2000) (internal quotation omitted) (citing *Brady v. Maryland,* 373 U.S. 83, 87 (1963)). "This includes both impeachment and exculpatory

---

[4] The Nebraska Supreme Court also issued a second basis for denial, finding that as O'Kelly's opinion did not fall within the purview of Nebraska Revised Statutes § 29-1912, the State had no duty to disclose it to Parnell. (Filing 14-1 at CM/ECF pp. 12-15.) Although Parnell also sought review of this portion of the denial in his initial Petition (filing 1 at CM/ECF p. 8), he did not include this argument in his Amended Petition (*see* filing 24), therefore it shall not be addressed further here.

evidence." *U.S. v. Sturdivant*, 513 F.3d 795, 803 (8th Cir. 2008). However, even if *Brady* is violated a conviction will stand where the violation was "not prejudicial and amount[s] to harmless error." *Id.* (citation omitted). As such, "[w]hen analyzing a *Brady* claim, we do not reweigh evidence, assess the credibility of witnesses, and decide whether the suppressed evidence establishes the guilt of a third party beyond a reasonable doubt or exonerates petitioner" or otherwise determine whether a state would have had the case go to the jury had the favorable evidence been disclosed. *Scott v. Mullin*, 303 F.3d 1222, 1232 (10th Cir. 2002) (cleaned up). Instead, the court looks to determine "whether we can be confident that the jury's verdict would have been the same" had the disclosure complied with *Brady*. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 453 (1995)). Put another way, evidence is only material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Sturdivant*, 513 F.3d at 803.

The issue of when a delayed disclosure of *Brady* material constitutes a due process violation has not been squarely addressed by the United States Supreme Court.[5] The Eighth Circuit has interpreted *Brady* to hold that due process is satisfied "if the [previously undisclosed] information is furnished before it is too late for the defendant to use it at trial." *United States v. Ferguson*, 531 F. App'x 773, 776 (8th Cir. 2013) (quoting *United States v. Almendares,* 397 F.3d 653, 664 (8th Cir. 2005)). In other words, the Eighth Circuit has interpreted *Brady* not to require disclosure by a specific time in the case such as at the close of discovery or by the beginning of trial. *See U.S. v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A mid-trial disclosure violates *Brady* only if it comes too late for the defense to make use of it."); *United States v. Jeanpierre,* 636 F.3d 416, 422 (8th Cir. 2011) (no *Brady* violation where defendant received police reports during trial and was given the opportunity to call any additional witnesses based upon the contents of the reports). Instead, disclosure

---

[5]As set forth previously, Parnell attempted review of this issue from the United States Supreme Court after the Nebraska Supreme Court affirmed his convictions on direct appeal, but the Court denied his petition.

of *Brady* materials must occur in time for a defendant to utilize the information contained in the disclosure. *Id.*

Upon review, the Nebraska Supreme Court properly considered the timing of the disclosure of O'Kelly's opinion and the nature of the information disclosed in relation to the trial timeline. (Filing 14-1 at CM/ECF p. 14-15.) Specifically, the court found that the disclosure of the O'Kelly material was made with enough time for the trial court to address the material at issue and for the court to fashion an appropriate resolution for its utilization, ultimately allowing the trial to proceed while giving Parnell the option to utilize O'Kelly as his own expert at the trial. (*Id.*) As the court concluded there was not a *Brady* violation based on the disclosure's timing and the nature of the information disclosed, there was no basis for the state courts to consider what may or may not have occurred had full disclosure of the O'Kelly material been made earlier, and certainly no basis for this court to address the veracity of Shute's testimony in the context of a *Brady* claim.

Accordingly, as the decision of the Nebraska Supreme Court was neither based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, nor was it contrary to, or involve an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, Claim One must be denied.

## D. Claim Two

In Claim Two Parnell, citing to the Supreme Court case of *Strickland v. Washington*, argues that under the Sixth and Fourteenth Amendments he was denied effective assistance of trial counsel because counsel failed to call O'Kelly as a witness at his trial. (Filing 24 at CM/ECF p. 12-13.)

In its opinion on direct appeal, the Nebraska Supreme Court addressed and rejected this claim on the merits, stating:

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

When reviewing claims of alleged ineffective assistance of counsel, an appellate court affords trial counsel due deference to formulate trial strategy and tactics. The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice. Deficient performance and prejudice can be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to lack of sufficient prejudice, that course should be followed.

Parnell's ineffectiveness claim fails because there is no reasonable probability that but for his counsel's failure to call O'Kelly, Parnell would have been acquitted. As we explained above, there was compelling evidence against Parnell. At most, O'Kelly's opinions would have degraded the precision accorded to the cell phone testimony. O'Kelly ultimately concluded that Parnell's cell phone was near the crime scene when the shooting occurred. The outcome would not have been different had O'Kelly testified and criticized Shute's methods. Therefore, the record conclusively refutes that Parnell was prejudiced by his counsel's conduct.

(Filing 14-1 at CM/ECF pp. 22-23.)

Parnell argues that, focusing only on the prejudice prong of *Strickland*, the Nebraska Supreme Court's "factual findings of a lack of prejudice" are incorrect, and that Parnell was prejudiced because the methodology and conclusions the State was allowed to present unchallenged at Parnell's trial was "misleading junk science." (Filing 30 at CM/ECF pp. 10-11.) Parnell submits that reported decisions

23

"specifically identifying and questioning the methodology and veracity of the opinions expressed by SA Shute" were available and could have been presented at his trial, and that the prosecution's "entire theory of guilt was without any direct or forensic evidence," indicating that without the uncontradicted testimony of Shute he would not have been convicted. (*Id.* at CM/ECF pp. 4, 11.)

First, it is unclear if Parnell attempts to allege the Nebraska Supreme Court misapplied *Strickland* by pointing out the court, in rendering its decision on his ineffective assistance claim, only addressed prejudice and not whether his trial counsel's performance was deficient. (Filing 30 at CM/ECF p. 11.) To the extent Parnell makes this argument, he is incorrect. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) (holding that a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies").

Second, it is worth reiterating that this court may not second guess the factual determinations made by the state court. It is Parnell who must rebut the presumption that the state court's factual determinations are correct "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Nebraska Supreme Court described the "compelling evidence" against Parnell in conjunction with O'Kelly's conclusions after performing the "drive test" as follows:

> As the district court noted, O'Kelly's opinions would not have been particularly helpful to Parnell. O'Kelly was critical of Shute's methods of analysis and his conclusions regarding the overlap area. But he also acknowledged that the crime scene was "situated in a valley between Cell Sites 729 and 201" and that Parnell's cell phone connected to tower 201 around the time of the shooting. And he placed Parnell's cell phone "in the general vicinity (1–2 miles of the crime scene) before, during and after the shooting." Thus, although O'Kelly critiqued Shute's methods, he reached conclusions similar to Shute's. O'Kelly's opinions

24

did not create a reasonable probability of a substantially different outcome of Parnell's trial.

The State presented powerful and compelling evidence against Parnell in the testimonies of Johnson and Nero. Johnson testified that Parnell threatened her with a gun just 2 days before the shooting. And her description of the shooter's car — "a blue Nissan Altima with a messed up front bumper" — matched the Altima Parnell drove. Additionally, Nero's testimony established that Parnell drove the Altima on the evening of the shooting and that Parnell wanted her to hide the car following the shooting. Furthermore, a detective testified that Parnell lied and claimed that he had no knowledge of an Altima, despite the fact that he had been stopped while driving an Altima months earlier. This evidence substantially diminishes the importance of the precision of the cell phone information.

(Filing 14-1 at CM/ECF p. 16.)

Applying the prejudice prong of the *Strickland* test, the Nebraska Supreme Court carefully examined Parnell's claim and found it wanting. The Nebraska Supreme Court reviewed the record and found that the evidentiary value of any evidence relating to Parnell's cell phone's location was significantly reduced due to the unfavorable testimony of two witnesses and the totality of the state's other evidence against Parnell. (*Id.* at CM/ECF pp. 16, 23.) In *Strickland* terms, even presuming Parnell's counsel had erred by not offering O'Kelly as a witness at his trial because O'Kelly's testimony would have made the testimony of Shute less persuasive or entirely ineffective, the state court found that nothing indicated that *but for* Parnell's trial counsel's failure to introduce O'Kelly as a witness that the outcome of his trial would be different. And Parnell offered no evidence or substantive argument that the state court's factual determinations relating to the weight of the evidence against him were incorrect.

On the contrary, the Nebraska Supreme Court found that O'Kelly's testimony would have supported Shute's opinion to the extent O'Kelly's opinion confirmed that Parnell's cell phone was in the vicinity of the shooting even though it did so

25

with less precision. (*See Id.* at CM/ECF p. 23.) In other words, even if O'Kelly had testified, and even if his testimony undercut the credibility of Shute, there was little likelihood that the outcome of the trial would have been different based on the weight of the evidence against Parnell and the underlying premise of both Shute and O'Kelly's opinions, neither of which aided in excluding Parnell from having committed the crimes of which he was accused.

The court finds that the Nebraska Supreme Court reasonably applied *Strickland*'s prejudice prong in concluding that counsel's performance with respect to O'Kelly's testimony did not constitute ineffective assistance of counsel and that its decision was not contrary to, or an unreasonable application of, *Strickland* or any other clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. As such, Claim Two must be denied.

## V. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Parnell is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Amended Petition for Writ of Habeas Corpus (filing 24) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 22nd day of June, 2022.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge